**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| JEFFREY P. PERROTTE,<br><br>Plaintiff,<br><br>v.<br><br>STACEY JOHNSON, et al.,<br><br>Defendants. | ) | Case No.: 1:15-cv-00026-LJO-SAB (PC)<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DEFENDANT HEBRON'S MOTION TO DISMISS BE DENIED<br><br>[ECF No. 14] |

Plaintiff Jeffrey P. Perrotte is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c), and Defendants declined magistrate jurisdiction. (ECF Nos. 4, 15.)

Currently before the Court is Defendant Herbon's motion to dismiss, filed September 28, 2015.

**I.**

**INTRODUCTION**

This action is proceeding against Defendants Cindy Hebron, Stacey Johnson, and Jean LeFlore for retaliation in violation of the First Amendment, and against Defendants Johnson and LeFlore for cruel and unusual punishment in violation of the Eighth Amendment.

///

///

///

On September 28, 2015, Defendant Hebron filed a motion to dismiss the claim against her.[1] (ECF No. 14.) After receiving an extension of time, Plaintiff filed an opposition on December 2, 2015, and Defendant filed a reply on December 9, 2015. (ECF Nos. 20, 21.)

## II.

## DISCUSSION

### A. Motion to Dismiss Standard

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim, and dismissal is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Conservation Force v. Salazar, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quotation marks and citations omitted). In resolving a 12(b)(6) motion, a court's review is generally limited to the operative pleading. Daniels-Hall v. National Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007); Schneider v. California Dept. of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007)) (quotation marks omitted); Conservation Force, 646 F.3d at 1242; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The Court must accept the factual allegations as true and draw all reasonable inferences in favor of the non-moving party, Daniels-Hall, 629 F.3d at 998; Sanders, 504 F.3d at 910; Morales v. City of Los Angeles, 214 F.3d 1151, 1153 (9th Cir. 2000), and in this Circuit, pro se litigants are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor, Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012); Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir. 2012); Silva v. Di Vittorio, 658 F.3d 1090, 1101 (9th Cir. 2011); Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010).

///

///

[1] Defendants Jean LeFlore and Stacey Johnson have not yet filed a response to the complaint.

**B. Allegations of Complaint**

Plaintiff contends that Defendants engaged in retaliation for Plaintiff exercising his First Amendment rights to file grievances.

In May 2008, Plaintiff interviewed with Defendants Hebron, Leflore and Johnson for a mentor position with Walden House at California Substance Abuse and Treatment Facility (CSATF). Plaintiff was questioned regarding the number of prison grievances and lawsuits he filed in the past against prison staff. He was informed that if selected as a mentor candidate at the Walden House, he would be expected to use different methods in resolving any grievances other than the standard 602 inmate grievance procedure.

In October 2008, Plaintiff was called to the Facility Program Office where he was interviewed by Defendants Hebron, Leflore and Johnson. Plaintiff was questioned again about his history of filing grievances and in assisting other inmates in accessing the courts. Plaintiff was asked about a recent inmate grievance he filed regarding placement in a janitorial vocational training program and if he would be willing to refrain from filing grievances if he were accepted into the mentor program.

In November 2008, Plaintiff was accepted into the Walden House Substance Abuse Treatment Program as a mentor candidate. During orientation, Plaintiff was taught the tools of a therapeutic community and the family values of Walden House. During the mentor meetings, it was stressed to Plaintiff that grievances were to be resolved using the tools of the Walden House.

In August 2009, Plaintiff was called to the supervising counselor's office and Defendants Hebron, Johnson and Leflore were furious and yelled at Plaintiff regarding an article that had been published on July 22, 2009, in numerous newspapers which was critical of the Warden and the policies at SATF. Defendants called Plaintiff a liar for not mentioning the article (which had been submitted prior to interviewing for the mentor program) that violated the "family values" of the Walden house. A couple hours later, Plaintiff was "grouped" by all the mentors for writing the article and violating Walden House "family values" and was placed on therapeutic contract with the mentors. Plaintiff had to apologize to Defendants, give seminars to core groups, give seminars to resident clusters on trust, prepare a presentation to the mentors on trust, clean showers, and restrain from any mentor activities

for thirty days. Plaintiff was also removed from the band program and cluster responsibilities by his supervising mentor, Senior Mentor John Ray.

Plaintiff began receiving many complaints from residents regarding inappropriate conduct by Defendant Johnson during group sessions. Plaintiff requested a meeting with Defendant Johnson to address the concerns. The meeting took place in September 2009, in Johnson's office and Plaintiff was informed, "You represent Walden House, not the residents. Your job is to put any complaints about me to rest, not stir the pot. My expectation is that you will do your job. Don't bring these complaints to me again." Plaintiff contacted Defendant Leflore on the yard and told him about the complaints and Defendant Johnson's response to Plaintiff. Defendant Leflore told Plaintiff that Johnson was correct and that our role as mentors was to protect Walden House from any scrutiny by the prison administration.

In September 2009, during the union of body and mind event, Plaintiff was confronted by Defendant Johnson in the presence of Senior Mentor John Ray. Johnson was furious that Plaintiff had switched microphones prior to making announcements and prior to performing. Defendant accused Plaintiff of being a racist and stormed away.

Plaintiff was informed by Senior Mentor Ray the following day that Defendant Johnson had discovered that Plaintiff was assisting some residents in filing complaints against her and wanted to get rid of Plaintiff. Senior Mentor Ray also indicated that Defendants Johnson, Leflore and Hebron were afraid that Plaintiff was going to author an additional newspaper article that was critical of their behavior towards residents and critical of the drug program at the prison. Senior Mentor Ray informed Plaintiff that assisting residents had to come to an end or he would not be able to protect Plaintiff from Defendants.

In February 2010, Plaintiff was threatened by Defendants Johnson and Leflore about assisting residents in filing grievances and petitions in the court. Plaintiff was instructed to cease these activities immediately.

In March 2010, Plaintiff was informed by Walden House Provider, Sue Rudd, that Defendants Johnson and Leflore had asked her to lie regarding Plaintiff's work in the cluster to justify firing Plaintiff and removing him from the program.

In July 2010, Plaintiff was told by Senior Mentor G. Scott Holland that Defendant Johnson was "dead-set" on causing Plaintiff harm for helping residents file grievances against her. Holland bragged that he was having a relationship with Defendant Johnson.

In August 2010, Plaintiff requested a meeting with Defendants Johnson, Leflore and Hebron. Plaintiff informed Defendants of the complaints by residents regarding Johnson's conduct and Leflore's unwillingness to address the behavior as Program Director. Plaintiff requested Defendant Hebron, as the Warden's liaison to Walden House, do something about it. Defendants began yelling and screaming at Plaintiff that he was just an inmate and would not dictate anything to them. Plaintiff was warned that if any grievances were filed by Plaintiff, they would take adverse actions against Plaintiff. Defendant Hebron stated, "You agreed not to file grievances if you were accepted into Walden House Mr. Perrotte. If you cannot abide by these rules, you will be sent back to B-Yard." It should be noted, White or Hispanic inmates who were sent back to B-Yard were assaulted by the inmates there for agreeing to inter-racial bunk. Defendants were aware of this and utilized this as a significant threat for residents.

In September 2010, Plaintiff received state certification as an alcohol and drug counselor and requested his pay be adjusted to be paid equivalent to other mentors who had received state certification. The request was denied.

On October 23, 2010, Plaintiff filed a CDCR-602 inmate appeal challenging the pay scale and mentor program. The appeal was assigned to Defendant Leflore who refused to answer the appeal. Plaintiff forwarded a request to prison administration to compel Defendant Leflore to answer the appeal which infuriated Defendant who contacted Plaintiff on the yard and threatened that "your days here are numbered."

On approximately November 1, 2010, Plaintiff was paged to an "emergency" mentor meeting. The mentors present indicated that Defendants Hebron, Leflore and Johnson had requested they "group" Plaintiff regarding the latest grievance and for violating the concepts of "family value." Plaintiff was placed on contract again and ordered to perform additional tasks to make amends for filing the grievance.

On approximately November 3, 2010, Walden House provider, Sue Rudd, warned Plaintiff that Defendant Johnson had told her that she was going to give Plaintiff a rules violation to "teach" him a lesson for filing the grievance on the mentor program in order to get Plaintiff fired. Ms. Rudd stated Johnson was very upset because Plaintiff was assisting some residents file complaints against Defendant Johnson and other Walden House staff.

On December 29, 2010, Plaintiff sent a letter to Doctor V. Eisen, Chief Executive Officer, Walden House, complaining about Defendants Johnson and Leflore. A copy of this letter was sent to Defendant's supervisor, Wayne Garcia, Defendant Hebron and Warden at SATF.

On February 19, 2011, Plaintiff served a CDCR-22 form on Defendant Leflore for not adjudicating Plaintiff's 602 inmate appeal on the mentor program as required by CDCR rules. Defendant Leflore snatched the form out of Plaintiff's hands and walked away stating, "I told you that you would regret this."

On March 10, 2011, Plaintiff was "confronted" by some of the mentors for pursuing the appeal on the mentor program and told to quit or stop filing grievances, writing Doctor Vitka, and helping residents with their grievances.

On March 18, 2011, Plaintiff went to facility captain V. Ramirez's office and filed a complaint against Defendant Johnson and requested internal affairs investigate her inappropriate relationship with mentor S. Holland for smuggling contraband into the prison. Captain Ramirez indicated he would contact internal affairs.

On March 25, 2011, Plaintiff again went to captain Ramirez's office and informed him of Defendant Johnson's knowledge of his "confidential complaint." Captain Ramirez indicated that he would look into it.

On May 29, 2011, Plaintiff was having a conversation with Defendant Leflore when Defendant Johnson walked up and started yelling at Plaintiff for failing to move a resident. Defendant Johnson stated, "Don't forget, you're just an inmate!" Johnson further stated, "I know your case, you're nothing but a mother-fucking drunk!" I immediately asked Defendant Leflore to address this outburst from Johnson as her immediate supervisor and Leflore just walked away. I told Defendant Johnson I

was immediately filing a staff misconduct complaint against her and Johnson stated, “You’re going to regret this and you’re going to regret ratting on me.”

On May 29, 2011, Plaintiff immediately filed a staff misconduct appeal against Defendant Johnson.

On April 1, 2011, Plaintiff received three separate laudatory memorandum from Walden House provider’s Sue Rudd, Mona Velasquez and Doris Trapp who were troubled with the actions of Defendant Johnson. Sue Rudd was immediately fired and ordered off prison grounds when she told Defendants she was going to tell the truth about their retaliatory conduct towards Plaintiff. Mona Velasquez and Doris Trapp were admonished for authoring memorandums.

On April 3, 2011, Plaintiff was served a CDC-115 Rules Violation Report authored by Defendant Johnson alleging “Behavior That Could Lead to Violence.” This fraudulent disciplinary report was logged as F-11-03-013 and was motivated by Plaintiff filing the staff misconduct appeal.

On April 8, 2011, Plaintiff was called before Senior Hearing Officer Lieutenant James who found Plaintiff not guilty of the charges filed by Defendant Johnson. Correctional officer E. Guillen testified that the allegations by Defendant Johnson were not true as officer Guillen witnessed the interaction referenced in the CDC-115. Lieutenant James found the charges to be in retaliation for Plaintiff filing the staff misconduct appeal.

Approximately two days later, Plaintiff was confronted by Defendant Johnson who stated, “you got lucky on the 115 but I have something else planned for you.”

On April 10, 2011, Plaintiff again contacted the facility captain to inquire as to when Plaintiff would be interviewed by internal affairs and to inform the captain of the continued threats by Defendants Johnson and Leflore.

On April 12, 2011, Plaintiff authored and forwarded a second letter to Doctor E. Eisen, Walden House, regarding the actions of her employees.

On April 14, 2011, former Walden House provider, Sue Rudd, emailed Plaintiff’s website detailing retaliatory actions by Defendants Johnson and Leflore against Plaintiff for engaging in protected conduct.

On April 16, 2011, Plaintiff was contacted on the yard by Lieutenant Alva who stated, "Did you get your new chrono yet?" Plaintiff indicated that he did not know what Alva was talking about and he stated, "Oh, you soon will."

On April 19, 2011, Plaintiff was paged to the program office and placed in a cage. Plaintiff was informed by DeOchoa that he was being rehoused in administrative segregation pending investigation into allegations Plaintiff made against Defendants Johnson, Leflore, and other Walden House employees. DeOchoa approached Plaintiff and stated, "You probably shouldn't have filed the grievances and 'ratted' on Stacey."

Also, on April 19, 2011, the administrative segregation sergeant approached the cage and stated, "This is the guy that likes to file grievances?" Shortly thereafter, the sergeant brought a large inmate out of a cell and placed him in the cage next to me. Inmate Stroud told Plaintiff the Sergeant wanted him to come and talk to Plaintiff about being his cellie. Inmate Stroud then stated, "They brought your Jewish food to the cell already, I'm Jewish too." The sergeant came back and said, "Okay let's cell them up." Both of them were cuffed-up and brought to a cell. After the cell door was closed, inmate Stroud squeezed by Plaintiff to make sure he was the first to be uncuffed. As soon as the handcuffs were removed from inmate Stroud, he instantaneously began striking Plaintiff in the face and torso area. The escorting officer, Megallon, immediately began spraying o.c. pepper spray into the cell and covered Plaintiff's body with spray. Plaintiff was still cuffed and was now being struck without the ability to see. Once the assault ended, Plaintiff was pulled from the cell and escorted to a shower for decontamination. Plaintiff was told, "This is what happens to those who like to tell on staff in ad-seg." Plaintiff was suffering excruciating pain from the assault and from the o.c. pepper spray which covered his entire body including the groan area as Plaintiff was only wearing a pair of boxer shorts. Plaintiff was escorted to a holding cell and the ad-seg sergeant approached and Plaintiff stated, "Nice set-up." He responded, "prove it." After being housed in a different cell, Plaintiff was informed by an officer that inmate Stroud was a level IV inmate (Plaintiff was a level II at the time), a validated Skinhead and member of the Security Threat Group II and that Plaintiff should never have been placed in the cell with Stroud under any circumstances.

On April 20, 2011, Plaintiff was interviewed by the facility F captain. Plaintiff told the captain that he wanted an investigation done on the assault and battery suffered on April 19, 2011. The captain stated, "good luck on that."

Approximately ten days later, Plaintiff was pulled from the ad-seg cell and interviewed by Investigative Services Lieutenant S. Ramirez. During this interview, Plaintiff shared all of the information Plaintiff knew about Defendants Johnson, Leflore and other Walden House employees, also about the retaliation Plaintiff was experiencing for filing grievances by all Defendants. Lieutenant Ramirez took a few notes but then began questioning Plaintiff regarding Plaintiff's daughter, Ashley. Plaintiff asked the Lieutenant why he wanted to know about Plaintiff's daughter and the Lieutenant refused to answer. Plaintiff was returned to the cell and discovered that all of Plaintiff's properly, including legal work, had been removed by investigative services.

On April 27, 2011, Plaintiff appeared before Classification and was retained in ad-seg. Plaintiff requested an investigation regarding the assault and battery suffered on April 19, 2011.

On May 10, 2011, Plaintiff was placed in a holding cell by investigative services where Plaintiff's property was in boxes. Plaintiff was given thirty minutes to decide what three boxes, out of six, Plaintiff was going to keep. Plaintiff discovered some of Plaintiff's legal work and property missing and damaged.

On May 20, 2011, an officer approached Plaintiff's cell and stated, "The reason you're still in ad-seg is because someone is trying to set you up and mailed in a letter detaining an escape plan and referring to a smuggled cell phone, along with photocopies of police badges." The officer then stated, "We think Stacey Johnson mailed it in."

Approximately two days later, Plaintiff received a letter from Plaintiff's wife, Michelle Perrotte, indicating that her, Plaintiff's daughter Ashley, and Plaintiff's father-in-law, Doctor Edward Lambert, had just been interviewed by Special Agent John Santos with the CDCR regarding an escape letter that had been addressed to Plaintiff and intercepted by the prison on April 27, 2011. The letter was purportedly signed by Plaintiff's daughter Ashley with a fake return address in Pasadena, California. CDCR believed that the letter was written to cause Plaintiff significant harm and the

investigation did reveal or suggest a possible motive for the origination of the letter with the incident involving Stacey Johnson at the prison.

On June 15, 2011, Plaintiff appeared before classification and cleared to be returned to Facility F. Classification indicated they believed Plaintiff was being wrongly accused and did not deserve to be in ad-seg. Plaintiff inquired as to what was being done regarding the retaliation for exercising protected conduct and the committee chairperson indicated that information was confidential.

Plaintiff was escorted back to Facility F with the remainder of Plaintiff's property. Approximately four hours later, officers came to the unit where Plaintiff was housed, cuffed Plaintiff and rehoused Plaintiff in ad-seg without the property Plaintiff had in his cell just four hours earlier. Plaintiff was told by the officers that Defendant Johnson had placed a CDCR-128B informational chrono in Plaintiff's file falsely indicating that she did not feel safe with Plaintiff on the facility because, among other statements, "Plaintiff threatened her that Plaintiff was going to send articles about her to newspapers." This CDCR-128B was dated April 13, 2011, just five days after Plaintiff had been found not guilty on the rules violation report issued by Defendant Johnson.

Approximately a week later, Plaintiff appeared before classification and told, "We believe this chrono is retaliation by Johnson and that it is safer for you to be away from her before she does something even worse to you. You will remain in ad-seg until you are transferred.

On August 5, 2011, Plaintiff filed an additional staff misconduct appeal on Defendant Johnson requesting an investigation into Johnson's retaliatory actions. The institution refused to process the appeal and after two attempts, Plaintiff sent the appeal to the Chief of Inmate Appeals in Sacramento, California, where it was again rejected. Plaintiff informed the Chief of Inmate Appeal of the investigation that Defendant Johnson mailed an escape letter to Plaintiff which caused Plaintiff significant injury, as well as filing the false disciplinary and the challenged CDCR-128B. Plaintiff's request for the appeal to be processed, as required by CDCR policies, was rejected.

On August 11, 2011, Plaintiff was transported to the California Men's Colony in San Luis Obispo, California. Upon arrival, a significant amount of Plaintiff's property was damaged and missing.

In April 2012, one of Plaintiff's Inmate Appeals on Defendant Johnson was granted at the Director's Level of review. This appeal required Defendant to remove reference to the CDC-115, Rules Violation Report, which was dismissed in the interest of justice from the fraudulent CDCR-128B authored by Defendant Johnson on April 13, 2011.

On July 10, 2012, Plaintiff received a letter, purportedly from Plaintiff's daughter, speaking of plans to destroy Plaintiff's chances at parole and other outrageous statements. The CDCR special agent that investigated the escape letter was contacted by Plaintiff's counselor and this letter was added to their investigative file. Agent Santos believed the letter was sent by the same source and was motivated by the recent Director's Level appeal grant.

On October 10, 2012, Plaintiff appeared before the parole board and the fraudulent (escape) letters and Defendant Johnson's false allegations were discussed at length.

On January 3, 2013, Plaintiff received another letter purportedly from Plaintiff's daughter with more outrageous content. This was forwarded to CDCR investigations.

On April 3, 2013, Plaintiff appeared before the parole board who required Plaintiff to address the escape letters sent by Defendant Johnson, as well as Defendant Johnson's false allegations in the CDCR-128B form April 13, 2011.

On August 28, 2013, Plaintiff's parole grant was reversed by Governor Brown due in part to the escape letters and false allegations by Defendant Johnson.

In October 2013, Plaintiff's attorney spoke with Special Agent John Santos regarding the escape letters used by Governor to reverse Plaintiff's parole grant and Santos stated, "I have determined the letters sent to Mr. Perrotte are fraudulent and intended to set Perrotte up to be denied parole at his upcoming hearings. Plaintiff continues to receive fraudulent letters from the same source.

On September 3, 2014, Plaintiff was required, again, to address the referenced letters and Defendant Johnson's fraudulent allegations on April 13, 2011, at Plaintiff's parole hearing.

At no time did Defendant Leflore and Hebron exercise their supervisory responsibility and prevent Defendant Johnson from continually retaliating against Plaintiff for exercising protected conduct, and, at times, participated directly in the retaliation.

///

**C. Screening of Complaint**

As an initial matter, Plaintiff's complaint was screened on April 13, 2015, and the Court found it stated a cognizable retaliation claim against Defendant Hebron. 28 U.S.C. § 1915A; Nordstrom v. Ryan, 762 F.3d 903, 908 (9th Cir. 2014) ("Dismissal for failure to state a claim under § 1915A 'incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).'") (quoting Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012); Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir. 2012) (section 1915(e)(2)(B)(ii) screening standard is the same as Rule 12(b)(6) standard). Defendant fails to acknowledge the Court's screening order and presents no arguments which persuade the Court it erred in determining that Plaintiff's retaliation against Defendant Hebron is cognizable or that any other grounds justifying relief from the screening order exist. See Ingle v. Circuit City, 408 F.3d 592, 594 (9th Cir. 2005) ("A district court abuses its discretion in applying the law of the case doctrine only if (1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result."). As explained below, Plaintiff's allegations are sufficient to allow him to proceed past the pleading stage.[2]

**D. Failure to State Cognizable Retaliation Claim**

As an initial matter, and notwithstanding the fact that Defendant fails to acknowledge and address the Court's April 13, 2015, screening order, Defendant fails to discuss or address the elements necessary to state a cognizable retaliation claim, and argues only that Plaintiff fails to provide sufficient facts to show Defendant Hebron *personally* violated his constitutional rights. Defendant's insubstantial briefing is suspicious given this Court's prior screening order.

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)). Also protected by the First Amendment is the

---

[2] Defense counsel is advised to exercise caution in filing future motions to dismiss after the Court has screened the complaint and found a cognizable claim without elaboration as to why or how the Court's screening order is incorrect. Considerable time and effort is made not only screening a civil rights case but in analyzing and addressing a defendant's motion after the matter has been screen. While a defendant had such a right, it must be made in good faith and not sought to delay or waste the Court's time since this case will require an additional review by a district judge, whose time is also limited due to caseload obligations.

right to pursue civil rights litigation in federal court without retaliation. Silva v. Di Vittorio, 658 F.3d 1090, 1104 (9th Cir. 2011). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978) (no liability where no evidence of personal participation).

Supervisor may only be held liable if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Some culpable action or inaction must be attributable to defendants and while the creation or enforcement of, or acquiescence in, an unconstitutional policy may support a claim, the policy must have been the moving force behind the violation. Starr v. Baca, 652 F.3d 1202, 1205.

The Court rejects Defendant's characterization of the allegations in the complaint as she points to only isolated factual claims without consideration of the complaint as a whole. Upon the Court's reading of the complaint in the light most favorable to Plaintiff, the Court finds Plaintiff's allegations are sufficient to give rise to a cognizable retaliation claim against Defendant Hebron.

Plaintiff was accepted into the mentor program in November 2008. Subsequent to the time, and contrary to Defendant's argument, Plaintiff presents the following relevant allegations as to Defendant Hebron:

> 20. In August, 2009, Plaintiff was called to the Supervising Counselor's Office where Defendants' Hebron, Johnson and Leflore were waiting for Plaintiff. Defendants were furious and began yelling at Plaintiff over an article that had been published on July 22, 2009, in numerous newspapers, critical of the Warden and policies at SATF. Defendants called Plaintiff a liar for not mentioning that this article had been submitted prior to interviewing for a Mentor position and that this violated the 'family values' of the Walden House, violated the

expectations of Mentors, violated their trust, and violated my agreement with them during the interview process. Plaintiff was told this made Walden House look bad, made Defendants look bad, and that the Warden was furious over the article and had demanded that something be done to Plaintiff. Plaintiff was informed that they would speak to the other Mentors to determine what would be done to address this perceived breach of trust to the Mentor Program.

21. A couple hours after this meeting, Plaintiff was summoned to an 'emergency' Mentor meeting. Plaintiff was 'grouped' by all the Mentors for writing the article and violating Walden House 'family values' and placed on therapeutic contract with the Mentors. Plaintiff had to apologize to Defendants, give seminars to Core Groups, give seminars to resident clusters on trust, prepare a presentation to the Mentors on trust, clean showers, and refrain from any Mentor activities for thirty days.

..........................................................................................................................

24. Plaintiff was informed by Senior Mentor Ray [in September 2009] that Defendant Johnson had discovered that Plaintiff was assisting some residents in filing complaints against her and wanted to get rid of Plaintiff. Senior Mentor Ray also indicated that Defendant Johnson, Leflore, and Hebron were afraid that Plaintiff was going to author an additional newspaper article that was critical of the drug program at the prison. Senior Mentor Ray informed Plaintiff that assisting residents had to come to an end or he would not be able to protect Plaintiff from Defendants.

…………………………………………………………………………………………

28. In August, 2010, Plaintiff requested a meeting with Defendant's Johnson, Leflore and Hebron. Plaintiff informed Defendants of the complaints by residents regarding Johnson's conduct and Leflore's unwillingness to address the behavior as Program Director. Plaintiff requested Defendant Hebron, as the Warden's liaison to Walden House, do something about it. Defendants began yelling and screaming at Plaintiff that he was just an inmate and would not dictate anything to them. Plaintiff was warned that if any grievances were filed by Plaintiff, they would take adverse actions against Plaintiff. Defendant Hebron stated, "You agreed not to file grievances if you were accepted into Walden House Mr. Perrotte. If you cannot abide by these rules, you will be sent back to B-yard. (It should be noted, White and Hispanic inmates who were sent back to B-Yard were assaulted by the inmates there for agreeing to inter-racial bunk. Defendants were aware of this and utilized this as a significant threat for residents.)

…………………………………………………………………………………………

31. On approximately November 1, 2010, Plaintiff was paged to an 'emergency' Mentor Meeting. The Mentors present indicated that Defendants' Hebron, Leflore and Johnson had requested they 'group' Plaintiff regarding the latest grievance and for violating the concepts of 'family values.' Plaintiff was placed on contract again and ordered to perform additional tasks to make amends for filing the grievance.

(ECF No. 1, Compl. at pp. 6-10.)

Accepting Plaintiff's allegations as true and construed liberally given his pro se status, and contrary to Defendant's argument, Plaintiff has alleged facts subsequent to the mentor program interviews and beyond mere supervisory liability to give to a cognizable retaliation claim against Defendant Hebron. The fact that Plaintiff's complaint contains more detailed allegations of misconduct as to Defendants Johnson and Leflore does not negate the factual allegations presented against Defendant Hebron. Furthermore, even if Defendant Hebron holds a supervisory position, the allegations presented in the complaint are sufficient, at the pleading stage, to demonstrate personal involvement in retaliating against Plaintiff for filing inmate grievances and authoring articles.[3] "The issue is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Indeed, "it may appear on the face of the pleadings that a recovery is very remove and unlikely but that is not the test." Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003). Based on the allegations presented in the complaint, Defendant Hebron's motion to dismiss for failure to state a cognizable claim should be denied.

**E. Qualified Immunity**

Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted). Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

[3] In his opposition, Plaintiff attributes further retaliatory comments made by Defendant Hebron in retaliation for Plaintiff's exercise of his rights under the First Amendment, and Defendant argues that Plaintiff "tacitly acknowledges by trying to amend his complaint in his opposition, his complaint is factually deficient." (ECF No. 21, Reply at 3.) Although the Court may not look to allegations set forth in an opposition in ruling on a Rule 12(b)(6) motion, Schneider v. California Dept. of Corrections, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), the Court need not consider such allegations in Plaintiff's opposition in rendering the instant ruling as the allegations in the complaint alone are sufficient.

reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

As set forth above, Plaintiff alleges a cognizable retaliation claim against Defendant Hebron under "clearly established" law. Thus, the Court proceeds to the second step to determine whether Plaintiff's rights were clearly established at the time of the violation.

Accepting Plaintiff's factual allegations as true, as this Court must, Defendant Hebron retaliated against Plaintiff for exercising his rights under the First Amendment. The Court concludes that a reasonable officer in Defendant's position could not have believed that her actions were lawful. Accordingly, Defendant's motion to dismiss based on qualified immunity should be denied.

**III.**

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that Defendant Hebron's motion to dismiss the retaliation for failure to state a cognizable claim for relief be DENIED.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with this Findings and Recommendation, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The parties are advised that failure to file objections within the specified time may

///

///

///

result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **March 11, 2016**

UNITED STATES MAGISTRATE JUDGE