**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY P. PERROTTE,<br><br>       Plaintiff,<br><br>  v.<br><br>STACEY JOHNSON, et al.,<br><br>       Defendants. | Case No. 1:15-cv-00026-LJO-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>[ECF No. 180] |

Plaintiff Jeffrey P. Perrotte is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendant Stacey Johnson's motion for summary judgment, filed May 28, 2019.

## I.

## RELEVANT BACKGROUND

This action is proceeding against Defendant Stacey Johnson for retaliation in violation of the First Amendment.

On February 6, 2017, Defendant Johnson filed an answer to the complaint.

On February 7, 2017, the Court issued the discovery and scheduling order.

As previously stated, on May 28, 2019, Defendant Johnson filed a motion for summary judgment. Plaintiff filed an opposition on September 9, 2019, and Defendant filed a reply and objections on September 18, 2019.[1, 2]

## II.

### LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

[2] After receiving several extensions of time, Plaintiff's opposition was due on or before September 1, 2019. Although Plaintiff did not attach a proof of service to his opposition, it is self-dated on August 30, 2019 and August 31, 2019. (Pl. Opp'n at 55, 64; ECF No. 197.) Given that Plaintiff is incarcerated and proceeding pro se, the Court deems Plaintiff's opposition to be timely filed.

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence if deemed, admissible, material, and appropriate,

**III.**

**DISCUSSION**

**A.       Summary of Plaintiff's Allegations**

In May 2008, Plaintiff interviewed with Defendant Johnson for a mentor position with Walden House at California Substance Abuse and Treatment Facility (SATF). Plaintiff was questioned regarding the number of prison grievances and lawsuits he filed in the past against prison staff. He was informed that if selected as a mentor candidate at the Walden House, he would be expected to use different methods in resolving any grievances other than the standard 602 inmate grievance procedure.

In October 2008, Plaintiff was called to the Facility Program Office where he was interviewed by Defendant Johnson. Plaintiff was questioned again about his history of filing grievances and in assisting other inmates in accessing the courts. Plaintiff was asked about a recent inmate grievance he filed regarding placement in a janitorial vocational training program and if he would be willing to refrain from filing grievances if he were accepted into the mentor program.

In November 2008, Plaintiff was accepted into the Walden House Substance Abuse Treatment Program as a mentor candidate. During orientation, Plaintiff was taught the tools of a therapeutic community and the family values of Walden House. During the mentor meetings, it was stressed to Plaintiff that grievances were to be resolved using the tools of the Walden House.

In August 2009, Plaintiff was called to the supervising counselor's office and Defendant Johnson was furious and yelled at Plaintiff regarding an article that had been published on July 22, 2009, in numerous newspapers which was critical of the Warden and the policies at SATF. Defendant called Plaintiff a liar for not mentioning the article (which had been submitted prior to interviewing for the mentor program) that violated the "family values" of the Walden house. A couple hours later,

Plaintiff was "grouped" by all the mentors for writing the article and violating Walden House "family values" and was placed on therapeutic contract with the mentors. Plaintiff had to apologize to Defendant, give seminars to core groups, give seminars to resident clusters on trust, prepare a presentation to the mentors on trust, clean showers, and restrain from any mentor activities for thirty days. Plaintiff was also removed from the band program and cluster responsibilities by his supervising mentor, Senior Mentor John Ray.

Plaintiff began receiving many complaints from residents regarding inappropriate conduct by Defendant Johnson during group sessions. Plaintiff requested a meeting with Defendant Johnson to address the concerns. The meeting took place in September 2009, in Johnson's office and Plaintiff was informed, "You represent Walden House, not the residents. Your job is to put any complaints about me to rest, not stir the pot. My expectation is that you will do your job. Don't bring these complaints to me again." Plaintiff contacted Defendant Leflore on the yard and told him about the complaints and Defendant Johnson's response to Plaintiff.

In September 2009, during the union of body and mind event, Plaintiff was confronted by Defendant Johnson in the presence of Senior Mentor John Ray. Johnson was furious that Plaintiff had switched microphones prior to making announcements and prior to performing. Defendant accused Plaintiff of being a racist and stormed away.

Plaintiff was informed by Senior Mentor Ray the following day that Defendant Johnson had discovered that Plaintiff was assisting some residents in filing complaints against her and wanted to get rid of Plaintiff. Senior Mentor Ray also indicated that Defendant Johnson was afraid that Plaintiff was going to author an additional newspaper article that was critical of their behavior towards residents and critical of the drug program at the prison. Senior Mentor Ray informed Plaintiff that assisting residents had to come to an end or he would not be able to protect Plaintiff from Defendants.

In February 2010, Plaintiff was threatened by Defendant Johnson about assisting residents in filing grievances and petitions in the court. Plaintiff was instructed to cease these activities immediately.

In March 2010, Plaintiff was informed by Walden House Provider, Sue Rudd, that Defendant Johnson had asked her to lie regarding Plaintiff's work in the cluster to justify firing Plaintiff and removing him from the program.

In July 2010, Plaintiff was told by Senior Mentor G. Scott Holland that Defendant Johnson was "dead-set" on causing Plaintiff harm for helping residents file grievances against her. Holland bragged that he was having a relationship with Defendant Johnson.

In August 2010, Plaintiff requested a meeting with Defendant Johnson. Plaintiff informed Defendant of the complaints by residents regarding Johnson's conduct. Defendant Johnson began yelling and screaming at Plaintiff that he was just an inmate and would not dictate anything to them. Plaintiff was warned that if any grievances were filed by Plaintiff, they would take adverse actions against Plaintiff. Hebron stated, "You agreed not to file grievances if you were accepted into Walden House Mr. Perrotte. If you cannot abide by these rules, you will be sent back to B-Yard." It should be noted, White or Hispanic inmates who were sent back to B-Yard were assaulted by the inmates there for agreeing to inter-racial bunk. Defendants were aware of this and utilized this as a significant threat for residents.

In September 2010, Plaintiff received state certification as an alcohol and drug counselor and requested his pay be adjusted to be paid equivalent to other mentors who had received state certification. The request was denied.

On October 23, 2010, Plaintiff filed a CDCR-602 inmate appeal challenging the pay scale and mentor program. The appeal was assigned to Leflore who refused to answer the appeal. Plaintiff forwarded a request to prison administration to compel Leflore to answer the appeal which infuriated Leflore who contacted Plaintiff on the yard and threatened that "your days here are numbered."

On approximately November 1, 2010, Plaintiff was paged to an "emergency" mentor meeting. The mentors present indicated that Defendant Johnson had requested they "group" Plaintiff regarding the latest grievance and for violating the concepts of "family value." Plaintiff was placed on contract again and ordered to perform additional tasks to make amends for filing the grievance.

On approximately November 3, 2010, Walden House provider, Sue Rudd, warned Plaintiff that Defendant Johnson had told her that she was going to give Plaintiff a rules violation to "teach" him a

lesson for filing the grievance on the mentor program in order to get Plaintiff fired. Ms. Rudd stated Johnson was very upset because Plaintiff was assisting some residents file complaints against Defendant Johnson and other Walden House staff.

On December 29, 2010, Plaintiff sent a letter to Doctor V. Eisen, Chief Executive Officer, Walden House, complaining about Defendant Johnson. A copy of this letter was sent to Defendant's supervisor, Wayne Garcia, Hebron and Warden at SATF.

On February 19, 2011, Plaintiff served a CDCR-22 form on Leflore for not adjudicating Plaintiff's 602 inmate appeal on the mentor program as required by CDCR rules. Leflore snatched the form out of Plaintiff's hands and walked away stating, "I told you that you would regret this."

On March 10, 2011, Plaintiff was "confronted" by some of the mentors for pursuing the appeal on the mentor program and told to quit or stop filing grievances, writing Doctor Vitka, and helping residents with their grievances.

On March 18, 2011, Plaintiff went to facility captain V. Ramirez's office and filed a complaint against Defendant Johnson and requested internal affairs investigate her inappropriate relationship with mentor S. Holland for smuggling contraband into the prison. Captain Ramirez indicated he would contact internal affairs.

On March 25, 2011, Plaintiff again went to captain Ramirez's office and informed him of Defendant Johnson's knowledge of his "confidential complaint." Captain Ramirez indicated that he would look into it.

On May 29, 2011, Plaintiff was having a conversation with Leflore when Defendant Johnson walked up and started yelling at Plaintiff for failing to move a resident. Defendant Johnson stated, "Don't forget, you're just an inmate!" Johnson further stated, "I know your case, you're nothing but a mother-fucking drunk!" I immediately asked Leflore to address this outburst from Johnson as her immediate supervisor and Leflore just walked away. I told Defendant Johnson I was immediately filing a staff misconduct complaint against her and Johnson stated, "You're going to regret this and you're going to regret ratting on me."

On May 29, 2011, Plaintiff immediately filed a staff misconduct appeal against Defendant Johnson.

6

On April 1, 2011, Plaintiff received three separate laudatory memorandum from Walden House provider's Sue Rudd, Mona Velasquez and Doris Trapp who were troubled with the actions of Defendant Johnson. Sue Rudd was immediately fired and ordered off prison grounds when she told Defendants she was going to tell the truth about their retaliatory conduct towards Plaintiff. Mona Velasquez and Doris Trapp were admonished for authoring memorandums.

On April 3, 2011, Plaintiff was served a CDC-115 Rules Violation Report authored by Defendant Johnson alleging "Behavior That Could Lead to Violence." This fraudulent disciplinary report was logged as F-11-03-013 and was motivated by Plaintiff filing the staff misconduct appeal.

On April 8, 2011, Plaintiff was called before Senior Hearing Officer Lieutenant James who found Plaintiff not guilty of the charges filed by Defendant Johnson. Correctional officer E. Guillen testified that the allegations by Defendant Johnson were not true as officer Guillen witnessed the interaction referenced in the CDC-115. Lieutenant James found the charges to be in retaliation for Plaintiff filing the staff misconduct appeal.

Approximately two days later, Plaintiff was confronted by Defendant Johnson who stated, "you got lucky on the 115 but I have something else planned for you."

On April 10, 2011, Plaintiff again contacted the facility captain to inquire as to when Plaintiff would be interviewed by internal affairs and to inform the captain of the continued threats by Defendants Johnson and Leflore.

On April 12, 2011, Plaintiff authored and forwarded a second letter to Doctor E. Eisen, Walden House, regarding the actions of her employees.

On April 14, 2011, former Walden House provider, Sue Rudd, emailed Plaintiff's website detailing retaliatory actions by Defendant Johnson against Plaintiff for engaging in protected conduct.

On April 16, 2011, Plaintiff was contacted on the yard by Lieutenant Alva who stated, "Did you get your new chrono yet?" Plaintiff indicated that he did not know what Alva was talking about and he stated, "Oh, you soon will."

On April 19, 2011, Plaintiff was paged to the program office and placed in a cage. Plaintiff was informed by DeOchoa that he was being rehoused in administrative segregation pending investigation into allegations Plaintiff made against Defendant Johnson. DeOchoa approached

Plaintiff and stated, "You probably shouldn't have filed the grievances and 'ratted' on Stacey."

Also, on April 19, 2011, the administrative segregation sergeant approached the cage and stated, "This is the guy that likes to file grievances?" Shortly thereafter, the sergeant brought a large inmate out of a cell and placed him in the cage next to me. Inmate Stroud told Plaintiff the Sergeant wanted him to come and talk to Plaintiff about being his cellie. Inmate Stroud then stated, "They brought your Jewish food to the cell already, I'm Jewish too." The sergeant came back and said, "Okay let's cell them up." Both of them were cuffed-up and brought to a cell. After the cell door was closed, inmate Stroud squeezed by Plaintiff to make sure he was the first to be uncuffed. As soon as the handcuffs were removed from inmate Stroud, he instantaneously began striking Plaintiff in the face and torso area. The escorting officer, Megallon, immediately began spraying o.c. pepper spray into the cell and covered Plaintiff's body with spray. Plaintiff was still cuffed and was now being struck without the ability to see. Once the assault ended, Plaintiff was pulled from the cell and escorted to a shower for decontamination. Plaintiff was told, "This is what happens to those who like to tell on staff in ad-seg." Plaintiff was suffering excruciating pain from the assault and from the o.c. pepper spray which covered his entire body including the groan area as Plaintiff was only wearing a pair of boxer shorts. Plaintiff was escorted to a holding cell and the ad-seg sergeant approached and Plaintiff stated, "Nice set-up." He responded, "prove it." After being housed in a different cell, Plaintiff was informed by an officer that inmate Stroud was a level IV inmate (Plaintiff was a level II at the time), a validated Skinhead and member of the Security Threat Group II and that Plaintiff should never have been placed in the cell with Stroud under any circumstances.

On April 20, 2011, Plaintiff was interviewed by the facility F captain. Plaintiff told the captain that he wanted an investigation done on the assault and battery suffered on April 19, 2011. The captain stated, "good luck on that."

Approximately ten days later, Plaintiff was pulled from the ad-seg cell and interviewed by Investigative Services Lieutenant S. Ramirez. During this interview, Plaintiff shared all of the information Plaintiff knew about Defendant Johnson and the retaliation he was experiencing for filing grievances. Lieutenant Ramirez took a few notes but then began questioning Plaintiff regarding Plaintiff's daughter, Ashley. Plaintiff asked the Lieutenant why he wanted to know about Plaintiff's

daughter and the Lieutenant refused to answer. Plaintiff was returned to the cell and discovered that all of Plaintiff's property, including legal work, had been removed by investigative services.

On April 27, 2011, Plaintiff appeared before Classification and was retained in ad-seg. Plaintiff requested an investigation regarding the assault and battery suffered on April 19, 2011.

On May 10, 2011, Plaintiff was placed in a holding cell by investigative services where Plaintiff's property was in boxes. Plaintiff was given thirty minutes to decide what three boxes, out of six, Plaintiff was going to keep. Plaintiff discovered some of Plaintiff's legal work and property missing and damaged.

On May 20, 2011, an officer approached Plaintiff's cell and stated, "The reason you're still in ad-seg is because someone is trying to set you up and mailed in a letter detaining an escape plan and referring to a smuggled cell phone, along with photocopies of police badges." The officer then stated, "We think Stacey Johnson mailed it in."

Approximately two days later, Plaintiff received a letter from Plaintiff's wife, Michelle Perrotte, indicating that she, Plaintiff's daughter Ashley, and Plaintiff's father-in-law, Doctor Edward Lambert, had just been interviewed by Special Agent John Santos with the CDCR regarding an escape letter that had been addressed to Plaintiff and intercepted by the prison on April 27, 2011. The letter was purportedly signed by Plaintiff's daughter Ashley with a fake return address in Pasadena, California. CDCR believed that the letter was written to cause Plaintiff significant harm and the investigation did reveal or suggest a possible motive for the origination of the letter with the incident involving Stacey Johnson at the prison.

On June 15, 2011, Plaintiff appeared before classification and was cleared to be returned to Facility F. Classification indicated they believed Plaintiff was being wrongly accused and did not deserve to be in ad-seg. Plaintiff inquired as to what was being done regarding the retaliation for exercising protected conduct and the committee chairperson indicated that information was confidential.

Plaintiff was escorted back to Facility F with the remainder of Plaintiff's property. Approximately four hours later, officers came to the unit where Plaintiff was housed, cuffed Plaintiff and rehoused Plaintiff in ad-seg without the property Plaintiff had in his cell just four hours earlier.

Plaintiff was told by the officers that Defendant Johnson had placed a CDCR-128B informational chrono in Plaintiff's file falsely indicating that she did not feel safe with Plaintiff on the facility because, among other statements, "Plaintiff threatened her that Plaintiff was going to send articles about her to newspapers." This CDCR-128B was dated April 13, 2011, just five days after Plaintiff had been found not guilty on the rules violation report issued by Defendant Johnson.

Approximately a week later, Plaintiff appeared before classification and was told, "We believe this chrono is retaliation by Johnson and that it is safer for you to be away from her before she does something even worse to you. You will remain in ad-seg until you are transferred.

On August 5, 2011, Plaintiff filed an additional staff misconduct appeal on Defendant Johnson requesting an investigation into Johnson's retaliatory actions. The institution refused to process the appeal and after two attempts, Plaintiff sent the appeal to the Chief of Inmate Appeals in Sacramento, California, where it was again rejected. Plaintiff informed the Chief of Inmate Appeal of the investigation that Defendant Johnson mailed an escape letter to Plaintiff which caused Plaintiff significant injury, as well as filing the false disciplinary and the challenged CDCR-128B. Plaintiff's request for the appeal to be processed, as required by CDCR policies, was rejected.

On August 11, 2011, Plaintiff was transported to the California Men's Colony in San Luis Obispo, California. Upon arrival, a significant amount of Plaintiff's property was damaged and missing.

In April 2012, one of Plaintiff's Inmate Appeals on Defendant Johnson was granted at the Director's Level of review. This appeal required Defendant to remove reference to the CDC-115, Rules Violation Report, which was dismissed in the interest of justice from the fraudulent CDCR-128B authored by Defendant Johnson on April 13, 2011.

On July 10, 2012, Plaintiff received a letter, purportedly from Plaintiff's daughter, speaking of plans to destroy Plaintiff's chances at parole and other outrageous statements. The CDCR special agent that investigated the escape letter was contacted by Plaintiff's counselor and this letter was added to their investigative file. Agent Santos believed the letter was sent by the same source and was motivated by the recent Director's Level appeal grant.

On October 10, 2012, Plaintiff appeared before the parole board and the fraudulent (escape) letters and Defendant Johnson's false allegations were discussed at length.

On January 3, 2013, Plaintiff received another letter purportedly from Plaintiff's daughter with more outrageous content. This was forwarded to CDCR investigations.

On April 3, 2013, Plaintiff appeared before the parole board who required Plaintiff to address the escape letters sent by Defendant Johnson, as well as Defendant Johnson's false allegations in the CDCR-128B form April 13, 2011.

On August 28, 2013, Plaintiff's parole grant was reversed by Governor Brown due in part to the escape letters and false allegations by Defendant Johnson.

In October 2013, Plaintiff's attorney spoke with Special Agent John Santos regarding the escape letters used by Governor to reverse Plaintiff's parole grant and Santos stated, "I have determined the letters sent to Mr. Perrotte are fraudulent and intended to set Perrotte up to be denied parole at his upcoming hearings. Plaintiff continues to receive fraudulent letters from the same source."

On September 3, 2014, Plaintiff was required, again, to address the referenced letters and Defendant Johnson's fraudulent allegations on April 13, 2011, at Plaintiff's parole hearing.

**B.      Statement of Undisputed Facts**

1.      Between May 2008 and August 11, 2011, Plaintiff was incarcerated at the California Substance Abuse and Treatment Facility ("SATF") in Corcoran, California. (Compl. ¶¶ 16, 61; ECF No. 1.)

2.      In 2008, Plaintiff began participating in a mentorship program with Walden House. (Id. ¶ 18.)

3.      Plaintiff alleges that during his incarceration at SATF, Defendant Johnson was employed as a Supervising Counselor at Walden House at SATF. (Id. ¶ III(A).)

4.      Plaintiff alleges that, during his incarceration at SATF, Defendant Johnson retaliated against him for submitting prisoner appeals, filing complaints, filing lawsuits against prison staff, writing an article critical of SATF programs and policies, and for assisting other inmates with their inmate appeals and/or lawsuits. (Id. ¶ 2.)

5.      Plaintiff and Defendant Johnson had an altercation on March 29, 2011. (Id. ¶ 39;

Declaration of Stacey Johnson ("Johnson Decl.") ¶ 6, Ex A; ECF No. 184.)

6.     On March 30, 2011, Defendant Johnson filed a CDCR Form 115 Rules Violation Report (the "115") against Plaintiff as a result of the March 29, 2011 altercation between herself and Plaintiff. (Compl. ¶ 42; Johnson Decl. ¶ 6, Ex. A.) The 115 stated:

> On Tuesday, March 29, 2011, at approximately 0745 hours, while performing my duties as Supervising Counselor for Walden House, the following occurred. Inmate PERROTTE, H089472, F1-272L, was in the rotunda area of Facility 'F' Building 1, 'C' Cluster talking to Walden House Program Director, Jean LeFlore. When I approached them, they were having a discussion about another Inmate who was ducated to the SAT program on 3/26/2011, and his move to building 2 to accommodate his job assignment/program. Inmate PERROTTE was advising the Program Director that the Inmate did not need to move to Building 2 saying, "he can't be moved, he is a lower/lower!" I informed Inmate PERROTTE that the Inmate would be moved from Facility 'F' Building 1 to Building 2 due to the Inmate job/program assignment. Inmate PERROTTE stated, "Oh-no, he is not going to be moved he is a lower/lower and I do the bed moves for Building 1!" Then Inmate PERROTTE further stated, "Oh Stacy, why don't you just be quiet as I am not talking to you anyways!" I reminded Inmate PERROTTE that he is an Inmate and he should not forget where he is at. Inmate PERROTTE then stated, "Don't forget where you are, and don't forget where you came from … the fucking streets!" Inmate PERROTTE total blatant disregard for me, was observed by other Inmate's returning from breakfast and which could have included others.

(Johnson Decl., Ex. A; Declaration of Alec H. Boyd ("Boyd Decl."), Ex. D; ECF No. 182.)

7.     Defendant Johnson authored a CDCR Form 182-B ("128-B"), dated April 13, 2011, which stated:

> On March 29, 2011, inmate Perrotte was given a CDC 115 for 'behavior that could lead to violence.' Since receiving the write-up inmate Perrotte has continued to display behavior that could lead to violence and continues to be disrespectful, by telling me that 'I am going to regret writing him up, because he is going to send articles to the newspaper about me.' Due to the write-up that inmate Perrotte received he has caused racial issues between the Caucasian Inmate population, and myself, he continues to tell the inmates that I am no good and cannot be trusted. Inmate Perrotte stated to various inmates that he would have me hurt if I didn't drop the write-up; I have had various inmates come to me and tell me to watch my back, because inmate Perrotte was out to get me. He told me that he would file a lawsuit against me for writing him up. Due to the threatening and negative behavior that inmate Perrotte continues to display, I do not feel safe and I am asking that inmate Perrotte be removed from facility 'F'.

(Declaration of M. Voong in support of Defendant's Hebron's exhaustion-related motion for summary judgment, Ex. 11, ECF No. 45-11, p. 37 of 59.)

8.     Plaintiff's appeal log number SATF-Z-11-01857 alleged two instances of retaliation by

Defendant Johnson: (1) On April 14, 2011, Defendant Johnson filed a "General-Chrono-SAP" [also known as CDCR Form 128-B] which stated, in part, that on March 29, 2011 Plaintiff was given a CDC 115 for "behavior that could lead to violence;" and, (2) on June 15, 2011, Plaintiff was "placed in A.S.U. due to retaliatory allegations made by Walden House counselor S. Johnson." (Appeal Log No. SATF-Z-11-01857; Corral Decl., Ex. 16, ECF No. 45-6, p. 40 of 74; LeFlore MSJ Findings, ECF No. 157, p. 18:18-23, Order Adopting Findings, ECF No. 161.)

9.     Plaintiff's appeal log number SATF-Z-11-01857 requested that his transfer be classified as non-adverse, that Defendant Johnson be terminated and charged for making false retaliatory statements, and that all documents including those made by Defendant Johnson be removed from his central file. (Voong Decl., Ex. 11, ECF No. 45-11, p. 58 of 59.)

10.     Appeal log number SATF-Z-11-01857 was partially granted at the Third Level Review. As a result of the Level III decision granting in part appeal log number SATF-Z-11-01857, SATF ordered that Ms. Johnson amend the 128-B dated April 13, 2011, by removing the first sentence that referenced the dismissed 115, by May 27, 2012. Ms. Johnson had already completed the modification on April 23, 2011. (Voong Decl., Ex. 11, ECF No. 45-11, p. 59 of 59; Modification Order, Voong Decl., Ex. 11, ECF No. 45-11, p. 46 of 59.)

11.     The Appeals Examiner, in the Third Level Review of appeal log number SATF-Z-11-01857, did not impose any form of discipline on Defendant Johnson, and found that (apart from the first line referencing the 115 that had been dismissed) Defendant Johnson's 128-B "appropriately documented her observation of the appellant's behavior." (Third Level Appeal Decision, Voong Decl., ECF No. 45-11, p. 27 of 59.)

12.     The Third Level Review of appeal log number SATF-Z-11-01857 found that Plaintiff had failed to provide any documentation to indicate that, apart from the first sentence referencing the dismissed 115, contained any false information. (Third Level Appeal Decision, Voong Decl., ECF No. 45-11, p. 27 of 59.)

13.     On April 19, 2011, SATF transferred Plaintiff to its administrative segregation unit pending the investigation of the allegations he made against Walden House. (CDCR Form 114-D, Boyd Decl., Ex. E, ECF No. 182.)

14.     On June 15, 2011, Plaintiff was released back to Facility F, after the Investigative Services Unit determined there was insufficient evidence to charge Plaintiff at the time, and his retention in administrative segregation was no longer warranted.  (Third Level Appeal Decision, Voong Decl., ECF No. 45-11, p. 26 of 59.)

15.     On June 15, 2011, Plaintiff was transferred to administrative segregation because the prison determined he posed a threat to the safety of staff and inmates.  (Third Level Appeal Decision, CDCR Form 114-D, Voong Decl., ECF No. 45-11, pp. 26, 41 of 59.)

16.     Defendant Johnson, who was not a CDCR corrections officer, did not direct, sign, or approve any order transferring Plaintiff to administrative segregation.  (Johnson Decl., ¶ 3; CDCR Form 114-D's, Boyd Decl., Ex. E; Voong Decl., ECF No. 45-11, p. 41 of 59.)

**C.      Request for Judicial Notice**

Defendant requests the Court take judicial notice of the following: (1) Governor Jerry Brown's August 28, 2013 Indeterminate Sentence Parole Release Review; (2) California Department of Corrections and Rehabilitations Operation Manual ("DOM"), § 72010.7.1, Form 128-B, General Chrono; (3) Transcript of Plaintiff's June 29, 2017 Parole Reconsideration Hearing; and (4) Transcript of Plaintiff's June 26, 2018 Parole Reconsideration Hearing.  (Req. for Judicial Notice ("RJN"), Exs. A-D; ECF No. 186.)

Federal Rule of Evidence 201 permits the Court to take judicial notice at any time.  A judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources who accuracy reasonably cannot be questioned. Fed. R. Evid. 201(b).  Courts may take judicial notice of facts related to the case before it.  Amphibious Partners, LLC v. Redman, 534 F.3d 1357, 1361-1362 (10th Cir. 2008) (district court was entitled to take judicial notice of its memorandum of order and judgment from previous case involving same parties). This Court may judicially notice the records and filing of other court proceedings.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Bennett v. Medtronic, Inc., 285 F.3d 801, 802 n.2 (9th Cir. 2002).  This includes documents filed in state courts.  Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012).

1  Because the Court may take judicial notice of court record's because they are readily

2  ascertainable facts under Rule 201(b)(2), Defendant's request to take judicial notice of Exhibits A

3  through D is granted.

4        **D.    Defendant's Objections to Plaintiff's Evidence**

5        Defendant objects to several documents submitted by Plaintiff in opposition to her motion for

6  summary judgment.  The Court will not rule on all objections.  "[I]n motions for summary judgment

7  with numerous objections, it is often unnecessary and impractical for a court to methodically

8  scrutinize each objection and give a full analysis of each argument raised."  Doe v. Starbucks, Inc.,

9  No. SACV 08-cv-0582 AG (CWx), 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  "This is

10  especially true when many of the "objections are boilerplate recitations of evidentiary principles or

11  blanket objections" with limited or no analysis to the specific items of evidence.  Id.; see also

12  Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F.Supp.2d 1023, 1033 (C.D. Cal. 2013) (stating "[t]he

13  Court will not scrutinize each objection and give a full analysis of identical objections raised as to

14  each fact").

15        The Court need not and will not address each of Defendant's objections individually and will

16  only address the relevant objections if necessary to the resolution of the motion.  However, the Court

17  will address a few of the issues.  As to the declaration of Plaintiff, Defendant's objection as to hearsay

18  by non-parties (p. 59 lines 1-20; p. 62, lines 4-19; p. 62, lines 24-28; and p. 62, line 1 – p. 64, line 10)

19  is sustained  in that they are out of court statements being offered for their truth to which no applicable

20  exception applies.  In addition, Defendant's objection as to p. 57 line 26 through p. 64 line 19 of

21  Plaintiff's declaration is sustained as argumentative, legal conclusions, and irrelevant.  Defendant's

22  objection to the declaration of inmate James Deck is sustained because it is not dated or signed under

23  penalty of perjury, and therefore it cannot serve a valid evidence in opposing a motion for summary

24  judgment.  Fed. R. Civ. P. 56(c); 28 U.S.C. § 1746; see also Davenport v. Bd of Trs. of State CTr.

25  Comm. College Dist., 654 F.Supp.2d 1073, 1084 (E.D. Cal. 2009) (finding that an unsworn

26  declaration that was not signed under penalty of perjury was "not valid evidence for purposes of

27  deciding the Defendant's motion for summary judgment on the merits").

28

To the extent the Court did not explicitly address an objection, that objection is overruled as moot because the Court did not rely upon the particular underlying evidence in deciding the instant motion for summary judgment.

**E.    Findings on Defendant's Motion**

Plaintiff contends that on June 15, 2011, he was placed in the administrative segregation unit because of the retaliatory allegations set forth by Defendant in her 128-B.

Defendant moves for summary judgment on the grounds that the 128-B was not motivated by Plaintiff's protected conduct, and the 128-B advanced legitimate correctional goals.

A plaintiff may state a claim for a violation of his First Amendment rights due to retaliation under section 1983. Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995). A viable claim of retaliation in violation of the First Amendment consists of five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

Plaintiff must also show that his pursuit of his rights under the First Amendment written and/or verbal complaints about his medication was the substantial or motivating factor behind the issuance of the 128-B. Brodheim, 584 F.3d 1262, 1271 (9th Cir. 2009) (citing Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)). In this Circuit, Plaintiff need "only put forth evidence of retaliatory motive that, taken in the light most favorable to him, presents a genuine issue of material fact as to" Defendants' motivation. Brodheim, 584 F.3d at 1271 (citing Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003)) (internal quotation marks omitted). This requires Plaintiff to offer either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence: (1) proximity in time between the protected conduct and the alleged retaliation, (2) expressed opposition to the conduct, or (3) other evidence that the reasons proffered by Defendants for the adverse action were false and pretextual. McCollum v. California Department of Corrections and Rehabilitation, 647 F.3d 870, 882 (9th Cir. 2011) (citing Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002)) (quotation

marks omitted).  Direct evidence of improper motive is only rarely available, and this case presents no exception.  <u>Watison</u>, 668 F.3d at 1114; <u>Mendocino Environmental Center v. Mendocino County</u>, 192 F.3d 1283, 1302 (9th Cir. 1999).  If the adverse action occurred "soon after" the protected conduct, such "timing can properly be considered as circumstantial evidence of retaliatory intent."  <u>Bruce</u>, 351 F.3d at 1288 (quoting <u>Pratt</u>, 65 F.3d at 805).  However, not every allegedly adverse action will support a retaliation claim.  <u>See, e.g.</u>, <u>Huskey v. City of San Jose</u>, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on "the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this'") (citation omitted).

Because a prisoner's First Amendment rights are necessarily curtailed, a successful retaliation claim requires a finding that "'the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals."  <u>Rizzo v. Dawson</u>, 778 F.2d 527, 532 (9th Cir. 1985).  Plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct he contends was retaliatory.  <u>Pratt</u>, 65 F.3d at 806.

1.    <u>Motivation For Issuance Of 128-B And Legitimate Correctional Goal</u>

Plaintiff contends that Defendant Johnson filed the 128-B containing false allegations for retaliatory purposes.  Plaintiff was subsequently placed in administrative segregation based on Johnson's false allegations.  Defendant argues that she had a legitimate penological reason for issuing the 128-B because it was issued solely in response to safety and security concerns regarding information about Plaintiff that she received from other inmates.  Johnson declares that in the weeks following the March 29, 2011 altercation with Plaintiff, several inmates informed Johnson of Plaintiff's threatening behavior.  (Johnson Decl. ¶ 7.)  The information caused Johnson to fear for her safety around Plaintiff.  (<u>Id.</u> ¶¶ 7, 8.)  Johnson discussed this information with her supervisor, Jean LeFlore.  (LeFlore Decl. ¶¶ 7, 8.)  Johnson decided to document her fears on a 128-B on April 13, 2011.  (Johnson Decl. ¶ 8.)  The 128-B specifically stated as follows:

> On March 29, 2011, inmate Perrotte was given a CDC 115 for 'behavior that could lead to violence.'  Since receiving the write-up inmate Perrotte has continued to display behavior that could lead to violence and continues to be disrespectful, by telling me that 'I am going to regret writing him up, because he is going to send articles to the newspaper about me.'  Due to the

write-up that inmate Perrotte received he has caused racial issues between the Caucasian Inmate population, and myself, he continues to tell the inmates that I am no good and cannot be trusted.  Inmate Perrotte stated to various inmates that he would have me hurt if I didn't drop the write-up; I have had various inmates come to me and tell me to watch my back, because inmate Perrotte was out to get me.  He told me that he would file a lawsuit against me for writing him up.  Due to the threatening and negative behavior that inmate Perrotte continues to display, I do not feel safe and I am asking that inmate Perrotte be removed from facility 'F'.

(Declaration of M. Voong in support of Defendant's Hebron's exhaustion-related motion for summary judgment, Ex. 11, ECF No. 45-11, p. 37 of 59.)

 As previously stated, to prevail on a retaliation claim, a plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct."  Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).  That is, Plaintiff must put "forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Defendant's] intend."  Brodheim, 584 F.3d at 1271; Bruce, 351 F.3d at 1289.  "[T]iming can properly be considered as circumstantial evidence of retaliatory intent."  Bruce, 351 F.3d at 1288 (quoting Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995)).  Plaintiff must demonstrate that the adverse action taken by defendant "did not reasonably advance a legitimate correctional goal."  Rhodes, 408 F.3d at 568.  Plaintiff bears the burden of providing the absence of legitimate correctional goals for defendant's challenged conduct.  See Pratt, 65 F.3d at 806 (citing Rizzo, 778 F.2d at 532).

With respect to the last element of retaliation, Defendant argues that she issued the 128-B chrono against Plaintiff for the legitimate correctional goal of the facility's safety and security and fear for her safety, which is clearly a legitimate correction goals.  Procunier v. Martinez, 416 U.S. 396, 412 (1974), partially overruled on other grounds, 490 U.S. (1989).

Here, the evidence, viewed in the light most favorable to Plaintiff, demonstrates that there is a genuine issue of material fact as to whether Defendant Johnson was motivated out of retaliation.  It is undisputed that on March 30, 2011, Defendant Johnson issued an RVR to Plaintiff for behavior that could lead to violence.  (Compl. ¶ 42; Johnson Decl. ¶ 6, Ex. A.)  It is further undisputed that the RVR was ultimately dismissed on April 8, 2011.  It is also undisputed that on April 13, 2011 (just five days

18

after the RVR was dismissed), Defendant Johnson issued Plaintiff a 128-B to have Plaintiff removed from Facility F because Johnson feared for her safety. (Pl. Opp'n, Ex. G.)

In his verified complaint, Plaintiff contends that on March 29, 2011, he was having a conversation with LeFlore when Defendant Johnson walked up and started to yell at Plaintiff for failing to move a resident. Johnson stated, "Don't forget, you're just an inmate!" Johnson further stated, "I know your case, you're noting but a mother-fucking drunk!" Plaintiff told Johnson that he was immediately filing a staff misconduct complaint against her to which she stated, "[y]ou're going to regret this and you're going to regret ratting on me." (Compl. at 17, ECF No. 1.) On this same date, Plaintiff filed a staff misconduct appeal against Defendant Johnson. (Id. at 17-18.) On April 3, 2011, Plaintiff received the RVR authored by Johnson charging him with "behavior that could lead to violence." (Id. at 18.) On April 8, 2011, a hearing was held on the RVR and Plaintiff was found not guilty. Two dates later, on April 10, 2011, Plaintiff was confronted by Johnson who stated, "[y]ou got lucky on the 115 but I have something else planned for you." (Id.) On April 13, 2011, Defendant Johnson issued Plaintiff a 128-B based on a threat to the safety of the institution and herself recommending removal from Facility F.

Based on the timing and alleged statements made by Defendant Johnson, there is a genuine issue of material fact as to whether Defendant Johnson issued the 128-B for an improper motive, i.e. to retaliate against Plaintiff for exercising his rights under the First Amendment. Although Defendant argues that she issued the 128-B for a legitimate correctional purpose, the proximity in time and the alleged statements made by Defendant Johnson, could reasonably support a jury finding for Plaintiff on the issue. Defendant may very well have believed that Plaintiff posed a threat to the safety of the institution and herself which lead to the issuance of the 128-B. Preserving institutional order, discipline, and security are legitimate penological interests that, if actually motivated the actions taken, will defeat a claim of retaliation. However, resolution of these issues is solely within the province of a jury, as the Court cannot engage in credibility determinations or weigh the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Manley v. Rowley, 847 F.2d 705, 711 (9th Cir. 2017). After considering the evidence by both Plaintiff and Defendant, a genuine issue of material facts exists which must be resolved at trial. Bruce, 351 F.3d at 1289-90 ("prison officials may not defeat a

retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right").

### 2. Governor Brown's Decision To Deny Plaintiff Parole

Plaintiff cannot seek recovery against Defendant Johnson for Governor Brown's denial of Plaintiff's parole. As an initial matter, Plaintiff cannot bring a claim against Defendant based on Governor Brown's denial of parole. Moreover, Plaintiff cannot establish that the 128-B caused Governor Brown to reverse the Board's decision to grant Plaintiff parole. The 128-B was only one of many factors considered by Governor Brown in rendering his decision. Cf. Nettles v. Grounds, 830 F.3d 922, 934-35 (9th Cir. 2016) (finding that a rules violation was one of many pieces of information that the Board of Paroles can review and that the presence or absence of a disciplinary infraction compels neither the granting nor the denial of parole); Davis v. Molina, No. 1:14-cv-1554-LJO-BAM (PC), 2018 WL 1157484, *5 (E.D. Cal. Mar. 5, 2018) (parole board's consideration of a 128-B General Chrono in making parole determination was not sufficient to overcome summary judgment); Hall v. Tehrani, No. C 09-0057 RMW (PR), 2013 WL 1325879, *5-7 (N.D. Cal. Mar. 29, 2013) (holding that a psychological evaluation that allegedly contained erroneous facts was not an "adverse action" because the Board of Parole is required to consider many reliable and relevant information and the evaluation was not clearly adverse).

The majority of the parole review discussed numerous other factors that led Governor Brown to conclude that Plaintiff presented an ongoing public safety risk. (RJN, Ex. A.) Governor Brown expressed concern that Plaintiff failed to take responsibility for his actions, including the nature of the commitment offense, Plaintiff's fleeing from the scene of the crash, and his history of prior DUI convictions. (Id.) Indeed, Brown noted, "[h]is running away while Mr. Rizzo burned to death was heartless. His convincing his wife to take the blame was irresponsible. Mr. Perrotte has been convicted of driving under the influence on three prior occasions, the last just three months prior to the murder." (Id.) Next, Governor Brown considered the impact on the victim's family stating Plaintiff's "actions had a devasting and long-lasting impact on the community and no Mr. Rizzo's loved ones. I note that many of Mr. Rizzo's family members have written heartfelt letters expressing their loss."

(Id.)  Brown then noted that Plaintiff minimized the role alcohol played in Mr. Rizzo's death.

(Citation.)  The Governor agreed with the psychologist's 2012 report which stated that Plaintiff had

"limited awareness and understanding of the factors and underlying issues associated with his

behavior leading up to, during, and following the life crime."  (Id.)  Brown noted that Plaintiff's

statements to the Board at his parole hearing demonstrated "an inability or unwillingness to accept

responsibility for his crime or even his addiction."  (Id.)  Brown summarized:

> It is clear to me that the risk Mr. Perrotte poses to society is directly linked to his inability
> to control his consumption of alcohol.  I am troubled that despite decades of involvement
> in Alcoholics Anonymous and Narcotics Anonymous he still minimizes the severity of
> his drinking problem.  I am concerned he will again become confident in his ability to
> consume alcohol in moderation despite his history of alcohol-related convictions and
> Mr. Rizzo's tragic death.

(Id.)

Governor Brown also discussed that Plaintiff was identified as a shot caller" for skinheads and

other white inmates in 2003 and 2005, and he was allegedly involved in ordering assault and inciting

riots.  (Id.)  Brown further cited psychological evaluations suggesting Plaintiff posed a safety risk if

released:

> Mr. Perrotte's elevated risk scores support my concerns.  The psychologist rated him
> as being in the moderate range of psychopathy, a moderate risk for violent recidivism,
> a medium risk for general recidivism, and a moderate overall risk if released.  These
> scores were based in part on Mr. Perrotte's lack of insight into his personality and
> negative character traits, inability to fully explain his past antisocial behavior and
> addictions, and minimization of his personal responsibility.

(Id.)

Governor Brown's single reference to the 128-B is not sufficient to establish that it was

determinative in his decision, particularly given that Brown did not consider it to be a serious

disciplinary action or a mar on Plaintiff's achievements as he noted that Plaintiff "completed a number

of vocational training programs and received above average and exceptional work ratings from his

supervisors.  He has not been disciplined for serious misconduct since 2004."  (Id.)   Thus, the 128-B

did not compel the denial of parole, and therefore the absence of the 128-B would not have compelled

the Governor to grant parole, especially in light of the other significant factors outlined.  Accordingly,

Plaintiff cannot recover from Defendant Johnson for any damages arising from Governor Brown's 2013 parole decision.

3. <u>Dismissal Of Action Because Plaintiff Misrepresented His Finances In Order To Proceed In Forma Pauperis</u>

Defendant argues that Plaintiff mispresented his financial status and claim he could not pay the filing fee on the application to proceed in forma pauperis, and the case should be dismissed.

"[A]ny court of the United States may authorize the commencement … of any suit, action or proceeding, civil or criminal … without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security thereto." 28 U.S.C. § 1915(a)(1). Prisoners must also "submit a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint" to be granted leave to proceed in forma pauperis. 28 U.S.C. § 1915(a)(2). The in forma pauperis statute provides that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that … the allegation of poverty is untrue…." 28 U.S.C. § 1915(e)(2); <u>see also</u> <u>Steshenko v. Gayrard</u>, No. 13-CV-03400-LHK, 2015 WL 1503651, at *5 (N.D. Cal. Apr. 1, 2015) ("Where the applicant has knowingly provided inaccurate information on his or her IFP application, the dismissal may be with prejudice") (citations omitted); <u>Emrit v. Yahoo! Inc.</u>, No. C 13-5951 SBA, 2014 WL 3841015, at *3 (N.D. Cal. Aug. 4, 2014) (dismissing with prejudice for omission of a "recent inheritance of approximately $31,000 [and] extensive litigation history"; rejecting "Plaintiff's conclusory assertion that he simply made a mistake in failing to report the inheritance he recently received").

Defendant points to letters by Plaintiff's wife in support of his release on parole and argues that "Plaintiff knew that he would have substantial community property funds upon his release" from prison, and his statements that he had "no ability to borrow any additional funds for this matter," were plainly false.

On the form application to proceed in forma pauperis, Plaintiff indicated that he made $27.00 a month from his prison employment, that he borrowed $2,300.00 in the last twelve months to be repaid

upon his release to obtain employment, and he that could not borrow any additional funds for this matter. Plaintiff further indicated that as of December 20, 2014, he had $502.00 in his prison trust account. Although Plaintiff points to letters written by Plaintiff's wife in support of his release on parole, there is no evidence before the Court to demonstrate that Plaintiff had access to and/or mispresented his own actual finances on the application form, such that the Court can make a determination that he acted in bad faith. Absent sufficient evidence, Defendant's request to dismiss this action must be denied.

## IV.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that Defendant's motion for summary judgment be denied.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **October 3, 2019**

_____
UNITED STATES MAGISTRATE JUDGE